15-2079 Joseph Roberts against Columbia College of Chicago. We'll hear from Ms. Franklin. Thank you, Your Honor. May it please the court. I'm Jamie Franklin and I represent Professor Joseph Roberts who brings this appeal of a grant of summary judgment by the district court with respect to two claims, breach of contract and age discrimination. I'd like to start with a discussion of the breach of contract claim in which Professor Roberts has pointed out two violations. Columbia College's failure to conduct an adequate investigation of what he had been accused of which was plagiarism and Columbia College's failure to consider a less severe sanction than termination. Both of which it was required to do under the terms of the tenure contract. So beginning with the issue of the adequacy of the investigation. The contract itself, the language is very short and very clear. It says the provost will undertake such investigation and comply with such procedures as he or she believes appropriate. Now granted that is a grant of discretion to the provost but what does appropriate mean? We think that Professor Roberts created a tribal issue of material fact on whether an Professor Roberts produced undisputed... The contract doesn't say she'll conduct an appropriate investigation. It says conduct such investigation as he or she deems appropriate. That's correct, your honor. Absolutely correct. I thought your contention was simply that the termination was a breach of the contract because he didn't engage in the misconduct. Well your honor, we're actually, we're not contesting the merits of the decision. We're contesting the procedure. Was the procedure complied with? That's something that can be done. That's the type of academic decision that can be reviewed. There's certainly case law that says that merits decisions on tenure, whether to grant tenure, whether to deny someone tenure, those are the kinds of decisions that are reserved for the Academy itself. We're actually bringing a more procedural argument here. We're saying court please look and see whether Columbia College complied with what it was obliged to do under the contract procedurally. But the bargain was that the Provost had, I don't know if I'll go so far as to say unfettered discretion, but excruciatingly broad discretion to figure out what investigation was appropriate, what remedy was appropriate. I agree, your honor, that the discretion was wide. However, every contract in Illinois carries with it an obligation to act in good faith, the doctrine of good faith and fair dealing, and that doctrine says if you have discretion, if you're vested with discretion under a contract, you have to act reasonably, with proper motive, not arbitrarily, not capriciously, and in a manner that's not inconsistent with the reasonable expectations of the parties. Okay, so does that mean that a court always has basically plenary authority to second guess every discretionary decision under a contract? Absolutely not, your honor. That would be contrary to Feldman, contrary to Blaisdell, and we respect academic freedom and we would never contend that. What we're saying is we created an issue of material fact as to whether the Provost, Louise Love, actually undertook an appropriate investigation. The analogy that I drew when I started to think about this more thoroughly was, I looked at her testimony. She said, what? I asked her, why didn't you do more of an investigation? She said, well, plagiarism is plagiarism. Well, to me that's like saying to someone who's accused of murder, murder is murder, so you don't get a trial, go directly to prison. It's a due process question for that person accused of murder and it's a procedural issue for Professor Roberts here in this case. We feel like the district court actually made a factual determination about what was appropriate under the contract, even though there were disputed material facts in the record on both sides. Well, let me drill down on that a little bit. What's the disputed material fact? Well, I think that actually what happened, I think, is known. She made the decision based on the report that was provided to her. Her evaluation was that it was plagiarism. To her, it was a very serious offense. She marched under the slogan, plagiarism is plagiarism, but I don't see the dispute about what happened. Well, I guess it's a dispute about what standard we apply. I think the dispute about what happened is really at the heart of what, why we're here today. Because she didn't undertake an investigation, she didn't know there was a dispute about what happened. And we say any reasonable provost under any reasonable tenure contract should at least interview the person being accused of a career-ending offense. That would be the least of what somebody ought to do. And we think that's a question of fact. What's appropriate under a contract? If she wasn't required to even find out what the other side of the story was, then every single professor at Columbia College has no protection for being terminated under this contract. It's not worth the paper it's printed on. We say there's some standard that has to be applied here, some reasonable standard. No, maybe she didn't have to do as much work as we've done in this case to develop the facts, but certainly she should have interviewed Professor Roberts and heard his side of the story. I would have thought that the contractual protection was on the merits of the decision. No, I did not engage in this contract, as opposed to this purely procedural argument under a contract that gives the University administration virtually unfettered discretion. And Your Honor, that's correct. I think that's why it has to be done this way, because we are mindful and we do completely agree with the Seventh Circuit's position that these merits decisions about who should receive tenure. Granting tenure, you're absolutely right, but I don't know what the point of a tenure contract is if you can't sue to challenge the merits of the decision, which you are not doing. It seems that you're making an even better argument on my behalf, so thank you, Your Honor. It's not an argument you have made, apparently. Correct. We felt that the case law supported the kind of claim that we brought, which was a procedural claim that attacked whether Columbia actually complied with the procedures under the contract. That's how we felt the case should be brought, based on what the case law is in this in this circuit, Your Honor. So, you know, I think the second issue is whether there should have been a less severe sanction. That is also inextricably tied up with whether there was an investigation that elicited the facts in the record. I mean, you can't talk about what the sanction should have been unless you know what actually happened. There is one factual issue that I wanted to flag, to the extent that I have time, and that issue is the fact that Professor Roberts listed this book on his CV. That's something the district court cared a lot about, and that I think that Columbia College also has mentioned several times on appeal, and it is, it's true. He did list the book on his CV, but the reason why that doesn't matter, and shouldn't have been dispositive, or shouldn't have been a factor the district court considered, though it did, was that Provost Love never knew that. She didn't base her investigation on anything to do with the CV. She only did two things that she testified to in her deposition. She looked at the memo, and she looked at the book. She didn't interview anybody. She didn't look at CVs. She didn't go to the department and ask to see, you know, any additional documents. So the CV was something that was never part of the is not something the district court should have drawn any negative inferences with respect to at all, but it did. So what you're describing, counsel, sound like material prejudicial deviations from the procedures established by the contract, right? That would be a summary, your honor. So why didn't you take it to the, what's the ERC elected representatives of the college, which is the internal review process reflected and referred to in the record? Yes, your honor. The ERC process is something that is an internal review process at the institution that doesn't have any power to actually review or make changes. So it makes a recommendation to the president, right? It can make comments, correct, to the administration. And then the president has the final decision. So why not, why go straight to court and bypass that mechanism? Well, your honor, the record, the facts in the record show that the reason, the real reason for that was that Professor Roberts had been a member of the ERC and didn't believe that there would be any benefit to him in doing so. Well, the contract does use the word solely, right? Yes. In terms of review. The contract does, your honor. It says a faculty member who wishes to challenge or seek review of the decision to dismiss him may do so solely in accordance with the following provisions. And of course, we read that to mean if you want to challenge the review this way, this is the only way you can do it. Not that you can't do it some other way, like filing an EEOC charge or going to the NLRB, both of which he did, or filing a lawsuit for breach of contract. We don't see it as a, as any sort of preclusion at all. We don't think the language supports that. And we think the scope of the ERC review itself, which was very narrow, also supports the idea that this couldn't be the only way to challenge whether Columbia College complied with its own procedures. So if there's, if there are no other questions, I will close. Okay. Thank you, Ms. Franklin. For the defense, Ms. Masters. May it please the court. Let me begin with the questions that your honor left off on, which has to do with the powers of the ERC. And it is absolutely our position that Professor Roberts, under the contract, was required. You have a low modulated voice. Sorry, I will speak louder. It is absolutely our position under the contract that Professor Roberts was required to seek ERC review, not only because of the language. Well, let me backtrack and say that it's our position that Professor Roberts seems to be confusing the idea that one does not have to seek review. In other words, people who may wish, you may wish to seek review if you wish to, but you don't have to seek review. But if you do want review of a termination decision, you must do it solely through the ERC. And he doesn't do that. He comes to court. And let me also say that the ERC review specifically reviews whether a material prejudicial mistake of fact concerning the conduct of the faculty member alleged to have engaged in is at issue, and material prejudicial deviations from the procedures established by the statement. That is precisely what Roberts is arguing here today. Let me try to put a real precise point on this, because I think it's clear enough that if Professor Roberts had wanted any internal review from the college, he had to do it through the ERC. That was his sole internal review. But the contract doesn't expressly say you can't go to court. Why isn't it, you know, correct me if I'm wrong, but it doesn't expressly preclude judicial review. It just says internally this is the review that you get. Because contracts have to be read with all their pieces together. And when we read the extensive nature of the review provisions, and put that in the context of the case law which says academic decisions are to be kept out of the maw, to use the term from Feldman, it's got to be that the Academy has the first opportunity to correct its conduct. Otherwise what we have is a straight, what we have here actually is a straightforward breach of contract case where someone who has not complied with a prerequisite, not performed his obligations under the contract, is coming to say a breach occurred. We have that right in the to, or alleged mistakes I should say, to correct them. And he didn't do that. He's just coming to court. And when he does that, all he's doing is disregarding the contract and acting the court to do precisely what it says it is not empowered to do, which is be a super personnel decision. If he had gone, if he had gone to the ERC, they've made a recommendation to the president, could, do you have any doubt he could sue in court for a breach of contract? He still could not sue on the merits, but he could sue that his, that his procedural rights had been violated. And that's all of those cases we cite, like Gutkin, Murphy, Feldman, Seitz, all of those cases, every single case that has come to this court. Let's talk about termination, not, look, I know courts want to stay out of deciding who deserves to get tenure, or who has earned tenure, or who gets the If it's going to have any meaning at all, it has to be enforceable from somebody outside of the university administration, right? The contractual protections of the procedures are enforceable. The merits of- But the academic dishonesty finding is not? Correct. That is absolutely our contention based on Sweezy, based on Feldman, based on Gutkin, based on Murphy. Some of these are from out of the our contention. Which of those cases within this circuit involve termination, the loss of tenure? Feldman, none of them involve, the issue actually hasn't come up, is the short answer to your question. Right. And because most folks don't have the temerity to suggest that this is beyond judicial review. Well, you're on- Apparently a couple of courts have bought it. Well, all of them who have considered it have bought it, starting because of academic decisions are not to be reviewed by the court, in terms of qualifications for teaching. And that's precisely what we have here. We have a straightforward challenge to business judgment, basically, on the contract claim. So you're, under those circumstances then, how does your tenure contract differ from employment at will? Because there's all types of procedural protections. Just procedural? Correct. If you touch the bases, you can do anything you want to for any reasons you want to. Can you repeat that, Your Honor? I'm sorry. That if you touch the procedural bases, the man at the university's administration can fire any tenured professor they want to, for any reason they want to. As long as we comply with the procedural protections. And if we don't, then someone can complain we have not complied with the procedural protections. That's the case law we cite to this court. And it is precisely why Ms. Franklin, on behalf of her client, has conceded that you cannot come to the court and ask the court to simply evaluate the merits of the decision. As Feldman states, all academic decisions are first, or can be categorized as speech decisions, and that's just not what the court is here to review. So that is our position. If I could, let me ask a question about the discrimination claim. Sure. And it's pretty simple. How is this not just pretty much a straightforward example of a cat's paw, in which the provost made her decision entirely on the basis of the report assembled by the chairman, Ravanas, and that he had overtly expressed ageist motive? The problem with the cat's paw analysis is that they don't have the right monkey. Because WASPI brings the allegations to Ravanas, Ravanas investigates them, and there's no indication that the only reason Ravanas would investigate an allegation of plagiarism is because he's interested in age discrimination. Or to put it differently, there's just no nexus between anything Ravanas says. And to be sure, there's only one comment involving age that they actually identify and pin down. They say he's made comments, but then they don't say what they are. It's the young, hip department one, certainly is about age. There's no datas to that. And more importantly, this is a very, very serious allegation. It's brought to him by an employee. That employee in the cat's paw analysis would be the monkey. So their cat's paw theory is just that it was Ravanas, and they have to show them that he wouldn't have investigated this allegation if it had been about anybody else. And he hasn't done that. And that's why the age discrimination claim must fail. I want to take a moment, if I can, if the court doesn't have any other questions, to clarify something we said in our brief, which is on page 41, we're discussing the Hanifi case and that the sanction for plagiarism is appropriate. I'm sorry. The sanction of termination is appropriate for plagiarism. And actually, Your Honor, that reminds me that Hanifi is a case that does involve tenure. That we parenthetically called that a case upholding termination. It really should have said supporting termination, because in that particular case, it's a whole list of cases that support termination. In that particular case, Professor Hanifi is identified as having plagiarized the dean and the provost. The provost draws up charges. The dean tells him, resign or you will be fired. He resigns, but then he goes to the president of the university and says, I want you to review my resignation, basically. He wants to revoke it. And the president of the university says, no, I'm not going to review your resignation. I think you would have been discharged anyway. He says, he refused to review the resignation or reverse the actions of the dean. And so I think, unfortunately, we called that upholding termination. It's really supporting termination, because ultimately, he resigns. I do have one more question. Plagiarism as plagiarism seems like a very coarse formulation. And the dean's review was really based on a side-by-side comparison of the two documents, the one prepared by Professor Roberts and the other, the original source material. But his defense wasn't that it was not copied from the source. His defense was that he meant to attribute it, but that the publisher screwed it up and didn't include the attribution that he intended. So it seems, to that degree, given the defense that Professor Roberts wanted to mount, the dean's investigation really was inadequate, because it didn't get to the merits of his defense, which is not that the documents weren't what they were. It was there was more explanation required. Well, certainly, Your Honor. And that begs the question, then, why did he go to ERC review? Because at ERC review, he would have had a hearing. And he could have presented this defense. He also could have told it to somebody else along the lines before he receives his termination letter. Instead, he just lets it sit there and comes to court and says, I was terminated. You didn't hear what I had to say. Well, how about our answer to that is, you should have told us. And you had a contractual right to do so before coming to court. So if the court has no further questions, we would ask that the judgment be affirmed. Thank you, counsel. Anything further, Ms. Franklin? Yes. How much time? Oh, I'm sorry. One minute. Oh, thank you. Take one minute. Thank you, Your Honor. I think that Judge Hamilton's statement or question about how does the tenure contract differ from an employee at will situation is exactly what I was trying to express earlier. That's the concern here, that Professor Roberts didn't have the opportunity to present this And I think you can get to the place where the substance of the decision can be reviewed through the mechanism of the case that we've brought here by looking at those procedural issues. If they're found to be lacking, then the ultimate result is found to be lacking. So I don't think it's true that we can't get to an evaluation of the merits of the termination. I just think we have to get to it through the proper method, which comports with Blaisdell and with Feldman and the rest of the cases on academic freedom. And then finally, with respect to why didn't Professor Roberts tell his side of the story, the record is clear on this. He sent a letter. He didn't even know what this was about. He had never received the memo until this litigation. So he sent a letter asking for full details. It was never responded to. He had no idea until we brought this case and did discovery what it was really about. Thank you, Counsel. Thank you, Your Honor.